✓ FILED ___ ENTERED
____ LOGGED _____ RECEIVED

9:40 am, Oct 01 2024

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____KM_____Deputy

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| v. | * | **Case Nos.** 1:24-mj-2431 |
| | * | 1:24-mj-2432 |
| **LARRY ADAMS,** | * | 1:24-mj-2433 |
| a/k/a as "LA", "L" or "Los Angeles" | * | 1:24-mj-2434 |
| **CURTIS JOHNSON,** | * | 1:24-mj-2435 |
| a/k/a as "Black C", | * | 1:24-mj-2436 |
| **OLANDO THOMPSON,** | * | 1:24-mj-2437 |
| a/k/a as "Burmp", | * | 1:24-mj-2438 |
| **RODRICK SIMMS,** | * | 1:24-mj-2439 |
| a/k/a as "Boo Boo", | * | 1:24-mj-2440 |
| **JUAN LAMONT JOHNSON,** | * | 1:24-mj-2441 |
| a/k/a as "JJ", | * | |
| **DEMARCO WATKINS,** | * | |
| a/k/a as "Pappa", "Pop" | * | UNDER SEAL |
| **SHELDON WELLS,** | * | |
| a/k/a as "Butters", "Butta" | * | |
| **ABDALLAH SIMMS,** | * | |
| a/k/a as "Moe C", "Mace", | * | |
| **AUREON JOHNSON,** | * | |
| a/k/a as "A", "Shorty A" | * | |
| **KEO WILLIAMS,** | * | |
| a/k/a as "Cheek" and | * | |
| **TIJEE BENETT,** | * | |
| a/k/a "Goo Goo." | * | |
| | * | |
| **Defendants.** | | |

**\*\*\*\*\*\*\***

### AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINTS AND ARREST WARRANTS

Your affiant, Josh Megli, a Special Agent with the Federal Bureau of Investigation, being

duly sworn, deposes and states as follows:

## I.   INTRODUCTION AND BACKGROUND

1.     I am a Special Agent with the Federal Bureau of Investigation ("FBI").  As such I

am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure

41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly

authorized by the Attorney General to request a search warrant. I am also an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2.    I have been a Special Agent with FBI since October of 2014. I have received training in interviewing and interrogation techniques, arrest procedures, search and seizure, narcotics, violent incident crimes, search warrant applications, and various other crimes. I am currently assigned to the Baltimore Field Office, Annapolis Resident Agency, which investigates all federal criminal matters for Anne Arundel, Calvert, Charles, St. Mary's, Queen Anne's, and Kent counties, Maryland.

3.    I submit this Affidavit in support of a criminal complaint and arrest warrants for LARRY ADAMS, CURTIS JOHNSON, OLANDO THOMPSON, RODRICK SIMMS, JUAN LAMONT JOHNSON, DEMARCO WATKINS, SHELDON WELLS, ABDALLAH SIMMS, AUREON JOHNSON, KEO WILLIAMS, and TIJEE BENETT (collectively the "TARGET SUBJECTS"). Based upon the facts in this Affidavit, I respectfully submit that there is probable cause to believe that the TARGET SUBJECTS engaged in a conspiracy to distribute and possess with intent to distribute controlled dangerous substances, in violation of 21 U.S.C § 846 (the SUBJECT OFFENSE).

3.    This Affidavit is based upon my participation in the investigation, my examination of reports and records, and my conversations with other law enforcement agents and other individuals. Because this Affidavit is being submitted for the limited purpose of obtaining a criminal complaint and arrest warrants, it does not include every fact learned during this investigation, but I have not excluded any facts known to me that would defeat a determination of

probable cause.  Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.  In making this Affidavit, I am relying only on the facts stated herein.

4.    Information in this Affidavit does not always set forth my personal observations, but rather at times reflects information from reports as well as information provided to me by other law enforcement agents who observed the events described and to whom I have spoken or whose reports I have read.

## II.    PROBABLE CAUSE

5.    In May 2023, the FBI and Task Force Officers ("TFO's") of the Annapolis Police Department ("APD") and the Anne Arundel County Police Department ("AACPD") began an investigation of a drug trafficking organization ("DTO") operating out of the New Vernon/Clay Street neighborhood in Annapolis, Maryland.

6.    In late June 2023, TARGET SUBJECT Curtis JOHNSON a.k.a. "Black C" was identified as a suspected cocaine and heroin dealer in the New Vernon/Clay Street neighborhood. In response to this information, FBI agents and TFO's began to conduct physical surveillance of the New Vernon/Clay Street neighborhood. As explained in detail below, agents and TFOs observed JOHNSON and others openly engaging in activity indicative of illegal drug dealing on a street corner. Through various methods, investigators identified some of the other individuals who engaged in regular drug dealing activity with JOHNSON on New Vernon/Clay Street. Those other individuals were TARGET SUBJECTS Olando THOMPSON, Larry ADAMS a/k/a "LA," and Rodrick SIMMS.

7.    Based on the investigation to date, and as explained more fully below, investigators believe the TARGET SUBJECTS play the following roles in this drug conspiracy. WATKINS is

a main cocaine supplier for CURTIS JOHNSON ("JOHNSON"). From time to time, AUREON JOHNSON ("A. JOHNSON") also serves as an alternate cocaine supplier to JOHNSON. JOHNSON in turn is a primary cocaine supplier to the street-level dealers of the Clay Street drug trafficking organization ("the Clay Street DTO").

8.     The street-level dealers of the Clay Street DTO own and operate an open-air drug shop located on a narrow one-way street in a Section 8 housing project near the intersection of New Vernon Street and Ridout Street, in the Clay Street neighborhood, of Annapolis, Maryland. The primary street-level dealer is THOMPSON, who is a mainstay of the drug shop. THOMPSON works with other street level dealers, including WELLS, ABDALLAH SIMMS ("A SIMMS"), RODRICK SIMMS ("R. SIMMS"), WILLIAMS, and BENETT to sell drugs, including cocaine, crack, heroin, various opioid pills, and PCP to customers who patronize the drug shop.

9.     On one occasion, THOMPSON even worked with an uncharged coconspirator to sell a prostitute and crack cocaine to a well-heeled customer from Maryland's Eastern Shore. These street level dealers, THOMPSON, WELLS, A. SIMMS, R. SIMMS, WILLIAMS, and BENETT, sometimes buy and sell drugs to and from each other for redistribution at the drug shop, depending on who has which drugs available for resale and who has potential a sale for a particular lined up. ADAMS, who is the only TARGET SUBJECT who lives in the area of the New Vernon Street drug shop, is believed to be the enforcer and protector of the drug shop and also engages in drug deals.

10.     In addition to supplying cocaine to the street-level dealers of the Clay Street DTO, JOHNSON also supplies cocaine to JUAN JOHNSON ("J. JOHNSON"). J. JOHNSON collects drug proceeds from various customers on JOHNSON's behalf, and on at least one occasion, J. JOHNSON worked with R. SIMMS to attempt to collect a drug debt on JOHNSON's behalf.

11.     Investigators identified some of the individuals involved in the DTO, including the TARGET SUBJECTS, and used a variety of investigative tools to learn more about the DTO, including the review of toll data, pen register data, GPS tracker information, social media, CCTV footage, grand jury subpoenas, confidential sources, and a recent federal wiretap investigation.

12.     Additionally, as more fully discussed below, on June 12, 2024, the Honorable Stephanie A. Gallagher authorized a federal wiretap for wire and electronic communications over a cell phone used by THOMPSON. That wiretap was subsequently extended to three additional cell phones – two used by JOHNSON and one used by ADAMS. The federal wiretap is ongoing but is set to terminate on October 6, 2024.

### A.     FEDERAL WIRETAP INVESTIGATION

13.     As noted above, the federal wiretap investigation was authorized on June 12, 2024. During the course of the wiretap, Judge Gallagher (and Judge Russell) authorized the interception of wire and electronic communications from several phones to include phones used by TARGET SUBJECTS THOMPSON, JOHNSON, and ADAMS. During the wiretap portion of the investigation, investigators intercepted numerous communications related to drug trafficking. Some of the relevant calls are transcribed or summarized below in each individual defendant's section. Below is a table of the intercepted lines and their activation dates.

| Date Authorized | Types of Communications Intercepted | Target Telephones | User | Termination Date |
|---|---|---|---|---|
| June 12, 2024 | Wire & Electronic | (443) 837-8879 (TT1) | Olando THOMPSON | October 6, 2024 |
| July 12, 2024 | Wire & Electronic | (443) 808-7138 (TT2)  (443) 613-1220 (TT3) | Curtis JOHNSON | October 6, 2024 |
| August 9, 2024 | Wire | (202) 717-2791 (TT4) | Larry ADAMS | October 6, 2024 |

B.    **TARGET SUBJECTS**

1.    **LARRY ADAMS**

14.    ADAMS is believed to be is a drug distributor for the New Vernon/Clay Street DTO based on his wire communications with associates and drug customers. He has been observed by physical and pole cam surveillance present at the New Vernon street drug shop observing drug transactions and handling cash provided by other DTO members. On August 9, 2024, investigators began intercepting wire communications from a cell phone used by ADAMS (TT4). Investigators believe ADAMS is the user of TT4 because in June of 2023, ADAMS used TT4 to arrange a meeting with an undercover DEA agent whom ADAMS believed to be a drug trafficker. Since that time, pole camera video combined with intercepted communications have confirmed that ADAMS is the user of TT4.  Interceptions are ongoing and terminate on October 6, 2024.

a.  **Drug Trafficking Surveillance and Intercepted Communications**

15.    The following conversations are examples of numerous intercepted wire communications during the course of the wiretap in which ADAMS arranged drug transactions with drug customers and associates.

16.    On August 10, 2024, at approximately 11:11 p.m. (session 89), ADAMS used TT4 to place an outgoing phone call (wire communication) to phone number (410) 972-7558, which investigators believe is used by an unknown male ("UM-7558"). This wire communication between ADAMS and UM-7558 occurred as follows:

| | |
|---|---|
| UM-7558: | Yo. |
| ADAMS: | Brodie. |
| UM-7558: | What's up? |
| ADAMS: | You got for five? |
| UM-7558: | Yeah. |
| ADAMS: | Nigga want a bag down here. You up? |
| UM-7558: | Yeah, I'm ready walk down there |

ADAMS:        Alright, bet.

17.    Based upon my training, experience, and involvement in this investigation, I believe that in this intercepted communication, ADAMS asked to buy a quantity of five unknown drugs from UM-7558. UM-7558 then said he would come to meet ADAMS to sell him the drugs.

18.    On August 12, 2024, at approximately 2:20 p.m. (session 123), ADAMS used TT4 to place an outgoing call (wire communication) to phone number (410) 972-7558, which investigators believe was used by UM-7558. This wire communication occurred as follows:

UM-7558:    Yo.
ADAMS:      Listen. Man wants a five down here bro.
UM-7558:    Alright. I'm ready to walk down now.

19.    Based upon my training, experience, and involvement in this investigation, I believe that in this intercepted communication, ADAMS asked to buy a quantity of five unknown drugs from UM-7558. UM-7558 then said he would come to meet ADAMS to sell him the drugs.

20.    On August 16, 2024, at approximately 5:34 p.m. (session 248), ADAMS used TT4 to place an outgoing telephone call (wire communication) to phone number (443) 569-9351, which investigators believe is used by WILLIAMS. This intercepted communication between ADAMS and WILLIAMS occurred as follows:

WILLIAMS:    Bro.
ADAMS:       Bro. Uh, Smallhead up there?
WILLIAMS:    Yeah. He's playing the game.
ADAMS:       Tell him somebody wants a five down here.
WILLIAMS:    Alright.
ADAMS:       Two of them.
WILLIAMS:    Alright.
ADAMS:       Alright.
WILLIAMS:    Bro, Mig, Mig up there.
ADAMS:       Mig aint got no more, I don't think. I think Smalls only one
             got some more.
WILLIAMS:    Alright.

7

ADAMS:                Alright.

21.    Based upon my training, experience, and involvement in this investigation, I believe that in this intercepted communication, ADAMS called WILLIAMS to tell him there was a customer who wanted to buy a quantity of five unknown drugs.

22.    Additionally, ADAMS was observed on pole camera footage in the New Vernon/Clay Street drug shop engaging in drug trafficking activities with other TARGET SUBJECTS THOMPSON and SIMMS. For example, on September 14, 2023, FBI agents and TFOs conducted physical surveillance, with the assistance of the pole camera, in the vicinity of New Vernon Street. At the beginning of the surveillance, ADAMS, THOMPSON, and SIMMS were hanging out on the sidewalk. At approximately 1:45 p.m., ADAMS walked over to THOMPSON. THOMPSON took out his wallet and handed a large wad of money to ADAMS, believe to be drug proceeds. ADAMS put the money in his pocket and walked up New Vernon Street to another location on the sidewalk approximately 50 feet away from THOMPSON.

23.    At approximately 2:05 p.m., an unknown male wearing a blue shirt and jeans approached THOMPSON and spoke with him. THOMPSON took a white plastic bag containing a white, rock-like substance, believed to be suspected drugs, out of his pocket, took out a small piece, and put the bag back into his pocket. THOMPSON then gave the white, rock-like piece to the unknown male, who then walked to a car and drove away. I believe that THOMPSON had just engaged in a drug deal with the unknown male and that THOMPSON and ADAMS were conspiring together to sell drugs in the New Vernon Street area.

    **b.  Money – Laundering Evidence**

24.    On or about mid-June 2023, DEA agents in Florida contacted DEA agents assigned to Group 51 of the Baltimore District Office. The Florida-based DEA agents (hereafter "DEA

Florida") informed the Baltimore-based DEA agents (hereafter "DEA Baltimore") that DEA Florida had recently received information about an upcoming drug deal in the Baltimore area. According to DEA Florida, an individual in the Baltimore area (later identified as ADAMS) wanted to drop off money to a drug cartel-linked representative to pay for a shipment of illegal drugs. DEA Florida did not provide any information regarding the specific type, price, or quantity of drugs that ADAMS sought to purchase.  According to DEA Florida, ADAMS planned to drop off the drug money to a cartel representative in the Baltimore area at a pre-determined time and place in or about late June of 2023.At the direction of DEA Florida, DEA Baltimore arranged for and conducted a controlled money drop with ADAMS, in which ADAMS delivered the money for the drug deal to an undercover DEA agent (hereafter "the UC") in the Baltimore area.

25.    On June 22, 2023, DEA Baltimore conducted surveillance of the meeting between the UC and ADAMS at the time and place determined in the June 21, 2023 text exchange. At approximately 11:00 a.m. on June 22, 2023, ADAMS arrived at the location. ADAMS approached the UC, and the UC provided the serial number B39231198K to ADAMS. ADAMS then gave the UC a white plastic bag containing $76,000 in cash.[1] During the surveillance, investigators positively identified the individual delivering the money as ADAMS.  Investigators recognized ADAMS from previous interactions with ADAMS. The DEA agents continued surveillance on ADAMS after he left the meeting with the UC and followed him as he drove back to the area of Ridout Street and New Vernon Street, in the Clay Street neighborhood of Annapolis, Maryland.

---

1 In order to maintain the integrity of DEA Miami's ongoing investigation, the DEA deposited the money into an undercover bank account and wired the money to another, cartel-linked account to complete the drug transaction.

### 2.    CURTIS JOHNSON

26.    JOHNSON is the primary supplier to the New Vernon/Clay Street DTO and has been observed by physical and pole cam surveillance present at the New Vernon street drug shop. Investigators have tracked JOHNSON's movements using cell phone location data.

27.    During the beginning of the investigation, on July 17, 2023, JOHNSON was arrested by APD detectives and charged with first degree assault, second degree assault and use of a firearm in a crime of violence among other charges. These charges are believed to have stemmed from JOHNSON's involvement in a non-fatal shooting in the Clay Street area on May 31, 2023. On March 19, 2024, JOHNSON pled guilty to handgun on person in the Circuit Court for Anne Arundel County related to the charges discussed above. He was released pending his sentencing which is set for January 8, 2025.

28.    A search warrant was obtained for JOHNSON's seized cell phone and investigators recovered the following text message conversation between JOHNSON using (443) 337-8381 and Mitchell Brown using (443) 979-6935. In this text message conversation, JOHNSON sent Brown a photograph via multimedia messaging service ("MMS"). The text message conversation, which occurred on July 24, 2023 between 5:35 p.m. and 5:36 p.m., read as follows:



JOHNSON:

BROWN:        Yo that's crazy

29.    Another text message conversation between JOHNSON using (443) 337-8381 and TARGET SUBJECT THOMPSON using TT1 was recovered. JOHNSON saved the contact name as "Burmp," which is believed to be THOMPSON's nickname based on a confidential source who

personally knows THOMPSON and told investigators that this was THOMPSON's nickname. The text message conversation occurred on June 15, 2023, from approximately 11:51 p.m. until approximately 11:54 p.m., and read as follows:

| | |
|---|---|
| THOMPSON: | Yooo u got hard |
| JOHNSON: | Yes |
| THOMPSON: | Wht the numbers |

30.     Based on the investigation and my training and experience, I believe that THOMPSON was asking JOHNSON if he had crack cocaine, when he asked if he had "hard".

31.     On July 12, 2024, investigators began intercepting wire and electronic communications from two cell phones used by JOHNSON (TT2, TT3). Investigators believe JOHNSON is the user of TT2 because he is the subscriber of the account. Investigators believe JOHNSON is also the user of TT3 because intercepted communications occurring over TT1 showed that JOHNSON used this phone number. Interceptions are ongoing and terminate on October 6, 2024. Interceptions from TT2 and TT3 confirm that JOHNSON is a drug distributor for the New Vernon/Clay Street DTO based on his wire and electronic communications with associates and drug customers.

32.     The following conversations are examples of numerous intercepted wire and electronic communications during the wiretap in which JOHNSON arranged and talked about drug transactions with drug customers and associates, to include TARGET SUBJECTS WATKINS, THOMPSON, and JUAN JOHNSON ("J. JOHNSON").

33.     On June 21, 2024, at approximately 3:22 p.m., (session 1287) THOMPSON used TT1 to place an outgoing telephone call (wire communication) to JOHNSON on TT3. Investigators believe THOMPSON is the user of TT1 because THOMPSON provided the phone

number for TT1 to a CHS during a controlled purchase of crack cocaine from THOMPSON in February of 2024. This telephone conversation occurred as follows:

| | |
|---|---|
| JOHNSON: | Yo. |
| THOMPSON: | Yo, hey you already got some situations? |
| JOHNSON: | Yo, that's kind of what I wanted to talk to you about. I don't get it all, right. Is there anyway, right, next time you come like not... not the last joint, the last joint I gave you that's from the last situation. Is there anyway we could bump it to $575 for you, only this one time. 'Cause I had to get something from somebody I don't usually get it from. And he packs the shit out of it, right. And I'm rushing 'cause I don't want to leave and y'all don't have something. |
| THOMPSON: | Man. |
| JOHNSON: | Like is that too much to ask? Ay, like bro for real listen though... Just to keep it a band with you. I'm telling you give me 575, bro I just paid 600 a ounce. I'm still taking a loss. You know, I'm just trying to not take a bigger loss. |
| THOMPSON: | Yeah. |
| JOHNSON: | (U/I) but it's only right now. I ain't even got,  I only got an eighth. That's just so my niggas can have some shit while I'm out. |
| THOMPSON: | When you coming back out? |
| JOHNSON: | I'll be back down there like six, seven o clock. |
| THOMPSON: | Alright. |
| JOHNSON: | You don't got to wait for me bro. You can go and get it... |
| THOMPSON: | No, no, no, I was calling you about. Sayin I'm about to meet up with Tip in a little bit, but he talking like he only got like four [U/I]. I asked him if he already had some jigs. I'm ready to just take my money and [U/I] I ain't getting ready to take my [U/I] |
| JOHNSON: | Yeah, please that's fine bro. You good regardless. |
| THOMPSON: | Yeah. Maybe I'll see you out later on. |
| JOHNSON: | Alright. |

34.    Based on this conversation, investigators believe that JOHNSON and THOMPSON were discussing a re-supply of illegal drugs. Based on my training and experience, I believe that "joint" is a term used by drug dealers to refer to a quantity of illegal drugs.  JOHNSON then asked if THOMPSON would be willing to pay JOHNSON $575 for a resupply of cocaine, in this case, cocaine. I believe cocaine is being discussed in this conversation because in other intercepted

communications JOHNSON stated that he deals in "sugar" and "caine". I believe based my training, experience, and involvement in this drug investigation, that these are slang terms for cocaine. Additionally, I believe based on the price point of $575, that JOHNSON and THOMPSON are discussing a half ounce of cocaine in this intercepted communication. "Is there any way we could bump it to 575 for you, only this one time?"   JOHNSON said he recently obtained drugs from a new source of supply.

35.    As discussed in more detail below, in the section for TARGET SUBJECT WATKINS, on July 14, 2024, JOHNSON and WATKINS discussed arranging a drug deal. In this call, JOHNSON called WATKINS saying that he (JOHNSON) was putting together 'bread' and wanted to know how much WATKINS can get 'eight' or 'nine' for. WATKINS agreed to check with his guy and calls JOHNSON right back. WATKINS offers to spot JOHNSON 'bread'. Additionally, based on the series of intercepted communications, I believe that JOHNSON said he was having a difficult time collecting money from the drug re-distributors who owed him money.

36.    On July 14, 2024, at approximately 7:06 p.m. (session 81), JOHNSON used TT2 to receive an incoming telephone call (wire communication) from telephone number (443) 534-8046, which investigators believe is used by Juan Lamont Johnson ("J. JOHNSON"). Investigators believe J. JOHNSON is the user of this cell phone because JOHNSON addresses J. JOHNSON by his known nickname, "JJ" in intercepted communications. This wire communication occurred as follows:

| | |
|---|---|
| JOHNSON: | Yo, yo. |
| J. JOHNSON: | Yeah, I'm waiting for the other girl to call back. One, she say, uh, she say two (U/I) she say she uh Tuesday the 16th. She says she's going have 300 for you. |
| JOHNSON: | Yeah, yo, that's good. Just let me know though, uh... I'm a go ahead and (U/I). |
| J. JOHNSON: | That's the... that's the one. That Church's daughter, I know she going to do it. She want the money so she can get down. |

| JOHNSON: | Yeah, that's good. It's cool though. I used to not take them if I had to kick out money. You know what I mean but... |
| J. JOHNSON: | I got her and then I got another little joint... she hadn't hit me back yet. She going to hit me back. She might have another 200. |
| JOHNSON: | Yeah, I say fuck it. The way it looking right now. I might be in the house for a couple days. So let me go buy some shit. |
| J. JOHNSON: | Alright. |
| JOHNSON: | Well, just let me know [U/I]. |

37.     Based upon my training, experience, and involvement in this investigation, I believe that in this wire communication, J. JOHNSON informed JOHNSON that J. JOHNSON expected to collect $300 from an unidentified female ("UF-1") on behalf on JOHNSON, "Yeah, I'm waiting for the other girl to call back… she says she going to have $300 for you." J. JOHNSON continued to say that UF-1 wanted to sell drugs on JOHNSON's behalf to earn enough money to get high ("get down") on her own, "She want the money so she can get down." J. JOHNSON then said J. JOHNSON expected to collect another $200 from another unidentified female ("UF-2") on behalf of JOHNSON, " I got her and then I got another little joint... she hadn't hit me back yet. She going to hit me back. She might have another 200." JOHNSON said he was eager to collect the money because he was low on supply ("The way it looking right now. I might be in the house for a couple days."), so he wanted to collect the money to pay for a re-supply, "So let me go buy some shit." Based upon prior dealings and previously intercepted communications between JOHNSON and J. JOHNSON, investigators believe the drug involved in this instance is cocaine.

### 3.     AUREON JOHNSON

38.     On August 28, 2024, at approximately 9:46 a.m. (session 3436), JOHNSON used TT3 to place an outgoing phone call (wire communication) to phone number (410) 570-8908, which investigators believe is used by TARGET SUBJECT A. JOHNSON. Investigators believe Investigators believe A. JOHNSON is the user of this cell phone because he is the subscriber on

the account and because, as explained below, JOHNSON refers to the user of (410) 570-8908 by

A. JOHNSON's known nickname, "A.". This wire communication occurred as follows:

| | |
|---|---|
| A. JOHNSON: | Yo. |
| JOHNSON: | Hey bro, you know me very, very, well, right? Very well. |
| A. JOHNSON: | Bro. Hey my nigga, that's why I'm like… |
| JOHNSON: | Listen to me, listen to me. Hey, no, listen to me bro. Hey listen to me champ. You know me very, very, very, well right? Like bro, I'm as stand up as they come bro. Hear me out very well. I don't duck niggas, I don't owe I don't fuck niggas over, I don't do that, bro. If I'm not catching up with you, A, bro, yo, I asked you last week, yo, just give me a little grace my nigga, right. I aint even… |
| A. JOHNSON: | Listen, yo, bro. |
| JOHNSON: | Listen. Hear me out. Just listen to me bro. |
| A. JOHNSON: | Don't give me that. So why would I be calling you about it [U/I]? |
| JOHNSON: | Hey, listen, listen, bro. |
| A. JOHNSON: | Why would I call you about that 15 times, bro? I told you I'm good my nigga [U/I]. But what I'm telling you, bro, is, bro, my nigga, you told me holla at my peoples, bro. Where you at my nigga? Come get this. |
| JOHNSON: | Bro, I'm in town. Hey bro, I'm in town, bro. I… |
| A. JOHNSON: | Yo, come, come and get that shit. You driving? |
| JOHNSON: | Bro, I'm not driving. No, I'm driving, I'm driving, bro |
| A. JOHNSON: | Bro, meet me, meet me by Chesapeake, yo. |
| JOHNSON: | Bro, I don't think you understand, bro. |
| A. JOHNSON: | My nigga, dude, bro. I don't want this shit, bro. Come get this shit, my nigga! |
| JOHNSON: | Bro I, I bro. Give me 20 minutes, bro. |
| A. JOHNSON: | Bro, my nigga, my nigga, listen bro. |
| JOHNSON: | But let me… |
| A. JOHNSON: | I'm trying, yo. Listen, listen, hold up, hold on up, bro. I'm trying to, you asked me do I know some peoples. I got some straight up good peoples, bro. My Muslim peoples bro. I got you my nigga. I'm not tripping over that my nigga. I don't even give a fuck about that, bro. |
| JOHNSON: | I don't think you understand. I aint say you tripping, bro. I'm talking about me. I'm talking about myself my nigga. Hear me out. You not listening. |
| A. JOHNSON: | Bro, but you know me, we could rap. Bro, you know I'm not even that type of nigga. |
| JOHNSON: | But listen. I was, I'll say, bro, I'm going to rap because, hear me out, because you not listening once again. Hey bro, I don't… |

| A. JOHNSON: | Say it again. |
| JOHNSON: | The situation that I'm in. Yeah, bro. |
| A. JOHNSON: | I, I, I, I'll be down there in 20 minutes, bro. Come, come, uh, I don't know. How about Chesapeake, you know where the, you know if like it you go straight past Chesapeake? Like going towards that gated joint? |
| JOHNSON: | Yeah. |
| A. JOHNSON: | That's where I used to live at. Come right there. Like we aint got to go in the gate, but just come back there somewhere. I'm already over here. |
| JOHNSON: | Alright, bet. |

39.    In response to the above call, investigators began physical surveillance in the area of South Cherry Grove Avenue in Annapolis, Maryland. At approximately 10:05 a.m. that morning, investigators observed A. JOHNSON standing at the pumps of a gas station, pumping gas into a white Ford pickup truck bearing Maryland tag 16691CJ. A review of the Maryland Motor Vehicle Administration ("MVA") database showed that the pickup truck was registered to A. JOHNSON. After pumping gas into his truck, A. JOHNSON walked into the gas station convenience store and remained inside for approximately five minutes. At approximately the same time that A. JOHNSON walked into the convenience store, investigators intercepted another wire communication over TT3 in which A. JOHNSON and JOHNSON changed plans and decided to meet in the parking lot of a Pep Boys on West Street in Annapolis, Maryland.

40.    In response to this information, investigators went to the Pep Boys on West Street to conduct physical surveillance. At approximately 10:15 a.m. that morning, investigators observed A. JOHNSON drive into the parking Pep Boys parking lot and park.  At approximately 10:19 a.m., investigators observed JOHNSON drive his gray BMW SUV bearing Maryland tag 1ES2814 into the parking lot and park on the opposite side of the lot from A. JOHNSON.  A. JOHNSON then got out of his pickup truck, walked over to JOHNSON's BMW, and sat down in the passenger's seat next to JOHNSON. A. JOHNSON appeared to give a plastic bag containing

an unknown substance to JOHNSON at that time. A. JOHNSON and JOHNSON sat in the BMW and spoke for approximately eight minutes, after which A. JOHNSON walked back to his pickup truck while JOHNSON drove away.

41.    Investigators followed JOHNSON as he left the Pep Boys and drove eastbound on West Street. At approximately 10:35 a.m., at the request of investigators, marked patrol units of the Annapolis Police Department ("APD") conducted a traffic stop on JOHNSON's BMW. The patrol officers briefly detained JOHNSON and searched the BMW. During the search of the BMW, officers found a plastic bag containing a white powdery substance. The officers seized the plastic bag containing the white powdery substance and then released JOHNSON from the scene of the traffic stop. The officers transported the plastic bag with the white powdery substance to the police station, where it was found to weigh 30.1 grams and field tested positive for cocaine. The suspected cocaine was entered into drug evidence at the APD station. Officers did not attempt to interview JOHNSON at the scene of the traffic stop, and JOHNSON did not make any voluntary statements of investigative value at the scene of the traffic stop.

### 4.    OLANDO THOMPSON

42.    Thompson is the primary distributor in the New Vernon/Clay Street neighborhood and has been observed by physical and pole cam surveillance at the New Vernon street drug shop conducting hand-to-hand drug transactions with customers on foot and in cars. Additionally, investigators have used confidential informants to conduct multiple controlled buys of crack cocaine with THOMPSON in February 2024, March 2024, and April 2024. The suspected crack recovered from each of these controlled purchases was sent to the Anne Arundel County Police Department drug lab for analysis, and for each controlled purchase, the recovered drugs tested positive for the presence of cocaine.

43.    On June 12, 2024, investigators began intercepting wire and electronic communications from a cell phone used by THOMPSON (TT1). Interceptions are ongoing and terminate on October 6, 2024. Interceptions from TT1 confirm that THOMPSON is a drug distributor for the New Vernon/Clay Street DTO based on his wire and text communications with associates and drug customers.

44.    The following conversations are examples of numerous intercepted wire communications in which THOMPSON coordinated and discussed drug transactions with drug customers and associates, such as TARGET SUBJECT WELLS.

45.    On July 8, 2024, at approximately 10:36 p.m. (session 3312), THOMPSON used TT1 to receive an incoming call (wire communication) from TARGET SUBJECT Sheldon WELLS, a/k/a "Butters," who used telephone number (443) 766-4688. Investigators believe that WELLS uses phone number (443) 766-4688 because he is the subscriber of that phone number, and investigators have observed WELLS associating with THOMPSON and another associate at the New Vernon Street drug shop. This wire communication between THOMPSON and WELLS occurred as follows:

| | |
|---|---|
| WELLS: | [U/I] Yo. |
| THOMPSON: | Where the fuck you at, bitch? |
| WELLS: | I just pulled up to the house, ready to go in the crib. |
| THOMPSON: | You got some cane? |
| WELLS: | Huh? |
| THOMPSON: | You got cane? |
| WELLS: | Yeah. |
| THOMPSON: | You got a half? |
| WELLS: | A half ounce? |
| THOMPSON: | Yeah. |
| WELLS: | Yeah. |
| THOMPSON: | Let me buy it. |
| WELLS: | Buy it? |
| THOMPSON: | Huh? |
| WELLS: | You heard me? |
| THOMPSON: | Yeah.  How much, bitch? |

| | |
|---|---|
| WELLS: | You already know, bitch. Huh? |
| THOMPSON: | What you going to do? |
| WELLS: | What you want me to bring it to you? |
| THOMPSON: | Fuck yeah, bitch. |
| WELLS: | Alright. |
| THOMPSON: | Alright. |

46.    Based on this conversation, investigators believe that WELLS and THOMPSON were discussing cocaine and that WELLS confirmed that he did have half an ounce of powder cocaine, "Yeah."   THOMPSON then asked to purchase the half ounce of powder cocaine from WELLS, "Let me buy it."

47.    On June 12, 2024, at approximately 4:56 p.m., (session 28), THOMPSON used TT1 to receive an incoming wire communication from telephone number (443) 569-2500, which was used by an individual who was later identified through physical surveillance was Wayne THOMPSON ("W. THOMPSON"). This telephone conversation occurred as follows:

| | |
|---|---|
| THOMPSON: | Motherfucker, where you at, dummy? |
| W. THOMPSON: | In the crib. |
| THOMPSON: | Huh, why you sleeping? |
| W. THOMPSON: | Cause I am.  What going on, cuz? |
| THOMPSON: | Nothing. I think I got a nice one for you. Nigga might want a half, but he want diddy. |
| W. THOMPSON: | Alright, alright. |
| THOMPSON: | You want me to tell him yeah or tell him no? |
| W. THOMPSON: | Who is it? |
| THOMPSON: | I can't tell you about my sell. Do you want me to tell him yeah or no? |
| W. THOMPSON: | Yeah. |
| THOMPSON: | Alright, what's the number you want me to sell? |
| W. THOMPSON: | Three. |
| THOMPSON: | Alright. Hey listen hey I'm going to tell you listen he normally move around the 275 range but I'm going to tell him 300 alright. |
| W. THOMPSON: | Alright. |
| THOMPSON: | Alright. |

48.    Based on this conversation, I believe, based on my training and experience that W. THOMPSON and THOMPSON were discussing that THOMPSON had a customer who wanted to buy a quantity of ("a half") of powder cocaine ("diddy").  THOMPSON and W. THOMPSON were intercepted on July 15, 2024 discussing cocaine for the price of $275 and investigators conducted surveillance of the meeting.

49.    Investigators also observed THOMPSON on pole camera footage in the New Vernon/Clay Street drug shop engaging in drug trafficking activities. For example, February 6, 2024, investigators conducted surveillance of New Vernon Street via the pole camera. At approximately 5:35 p.m. that day, ADAMS, THOMPSON, and several unidentified individuals were hanging out on the porch of a townhouse. An elderly black male wearing a red vest and red pants drove up to THOMPSON on an electric scooter and handed THOMPSON money. THOMPSON then reached into his pocket and pulled out a small plastic bag containing a white rock-like substance. THOMPSON took three small white rocks out of the bag and handed them to the unidentified male, who then drove away on his electric scooter. Approximately three minutes later, at 5:38 p.m., a black pickup truck with an identified Maryland license plate drove onto New Vernon Street and stopped at the curb in front of where THOMPSON and ADAMS were standing. THOMPSON walked to the driver's side window of the pickup truck and conducted a hand-to-hand exchange with the driver. THOMPSON then walked back to the porch and the pickup truck drove away.

50.    In another example, on May 31, 2024 at approximately 1:12 p.m. that day, TARGET SUBJECTS ADAMS, THOMPSON, and an unknown individual were hanging out on the sidewalk next to a red Toyota Sienna minivan that is owned and used by TARGET SUBJECT SIMMS. At approximately 1:17 p.m., an unknown person wearing a gray sweatshirt and a hair

scarf walked up to THOMPSON and handed him some money. THOMPSON then handed an unknown male (UM) an unknown small object while ADAMS watched. UM then turned and walked away. Investigators believed that THOMPSON engaged in a drug deal with the UM.

### 5.    RODRICK SIMMS

51.    SIMMS is another primary distributor in the New Vernon/Clay Street neighborhood and has been observed by physical and pole cam surveillance at the New Vernon street drug shop conducting hand-to-hand drug transactions with customers on foot and in cars. Investigators have tracked SIMMS's movements using cell phone location data and GPS vehicle trackers and have observed numerous drug transactions involving SIMMS on the pole cam. In addition, texts from the search of JOHNSON's seized phone (from his July 28, 2023 arrest) reveal iMessages discussing illegal drug dealing.

52.    For example, the iMessage conversation between JOHNSON on and SIMMS on (202) 320-0688, which occurred on July 10, 2023 between 2:26 pm and 2:27 pm. Investigators believe SIMMS is the user of (202) 320-0688 because, according to subpoena returns from Apple, Inc., SIMMS is the owner of the iCloud account associated with this telephone number. That text message conversation occurred as follows:

SIMMS:        "Need more"
JOHNSON:    "Bet"

53.    Based on this conversation, investigators believe that SIMMS was asking JOHNSON for more drugs, "need more," and JOHNSON agreed to provide them, "Bet."

54.    Investigators have also intercepted communications involving SIMMS and THOMPSON (TT1), JOHNSON (TT3), and ADAMS (TT4).  For example, on September 23, 2024, investigators intercepted multiple telephone conversations between SIMMS and JOHNSON on TT3. Based upon those intercepted wire communications, and other previously intercepted wire

communications, investigators believe TARGET SUBJECTS JOHNSON and J. JOHNSON sold gave a quantity of drugs to an individual named Willie Thompson BULLOCK a.k.a. "Boobie", but BULLOCK never paid JOHNSON for the drugs. In the intercepted wire communications between JOHNSON and SIMMS on September 23, 2024, SIMMS told JOHNSON about SIMMS's efforts to collect the drug debt from BULLOCK. SIMMS told JOHNSON that SIMMS went to "stake out" an apartment building where they believed BULLOCK was living, and SIMMS paid off the door man to let him into the building. SIMMS also told JOHNSON about how SIMMS knocked on the door and confronted BULLOCK's wife about the drug debt, but BULLOCK's wife said BULLOCK had been missing for twelve days and she did not have the money to pay the drug debt. The intercepted communications show that SIMMS knew he was collecting a drug debt because the intercepted calls indicated that SIMMS knew that BULLOCK was a frequent drug customer of the New Vernon Street drug shop, that SIMMS had sold to BULLOCK previously, and SIMMS knew where to go to collect money from BULLOCK. Investigators believe that these intercepted wire communications regarding SIMMS's efforts to collect the drug debt demonstrate that SIMMS conspires with JOHNSON to redistribute drugs throughout Annapolis.

55.    Investigators also reviewed the pole camera footage and observed SIMMS engaging in hand-to-hand transactions on multiple occasions.  As noted above, on September 14, 2023, SIMMS along with TARGET SUBJECTS ADAMS and THOMPSON were observed on pole camera footage in the New Vernon/Clay Street drug shop engaging in drug trafficking activities.

56.    Additionally, there are numerous other examples of SIMMS engaged in drug trafficking activities from August 28, 2023 through to the present. Specifically, SIMMS was observed on the pole cam conducting hand-to hand drug deals at the New Vernon Street drug shop

on 9/1/23 at 4:05pm, 9/7/23 at 4:38pm, 9/28/2023 at 2:50pm, 11/21/23 at 4:27pm, 3/21/24 at 10:22am, 5/6/24 at 8:56am, 8/21/24 at 11:23am, and 8/29/24 at 3:24pm. In the 9/7/23, 5/6/24, and 8/29/24 pole cam surveillance, the drugs (white rocks) are *visible* when SIMMS sells them.



**August 8, 2024 – Screenshot from Pole Camera Footage of Simms with suspected drugs**

### 6.    JUAN LAMONT JOHNSON (J. JOHNSON)

57.    J. JOHNSON is a cocaine dealer who often works with JOHNSON and THOMPSON to obtain cocaine and crack, which is then sold on New Vernon Street and elsewhere. J. JOHNSON has been intercepted in numerous calls with both JOHNSON (TT2 and TT3) and THOMPSON (TT1) arranging drug sales, negotiating price/quantity, and discussing general drug dealing.

58.    There are multiple calls between TARGET SUBJECTS J. JOHNSON and THOMPSON discussing drug trafficking. For example, on August 8, 2024, THOMPSON called J. JOHNSON to ask "how many" an unknown individual wants. J. JOHNSON responds, "six." Based on this communication, I believe that THOMPSON and J. JOHNSON were discussing drug

trafficking, specifically, an unknown individual was looking for "six" of a drug. I further believe that JOHNSON facilitated the drug deal between THOMPSON and the unknown individual by informing THOMPSON how much drugs the unknown individual wanted.

59.     In another example, on July 12, 2024, there was another intercepted communication between **TARGET SUBJECTS** J. JOHNSON and THOMPSON discussing drug trafficking. For example, on Curtis Johnson tells Juan JOHNSON that "If you got 300 on you" . . . "I might need that joint tomorrow in the beginning of the daytime." Based on this communication, I believe that JOHNSON and J. JOHNSON were discussing drug proceeds. Based upon prior intercepted communications, investigators believe J. JOHNSON sold $300 of cocaine on behalf of JOHNSON. In this intercepted communication, JOHNSON wanted to collect the $300 from J. JOHNSON so JOHNSON could use the proceeds for a resupply of drugs.

60.     In another example, on July 14, 2024, investigators intercepted another communication between TARGET SUBJECTS J. JOHNSON and JOHNSON discussing drug trafficking. In that conversation, J. JOHNSON said "She going to hit me back. She might have another 200."  JOHNSON replied "I might be in the house for a couple days. So let me go buy some shit."  Investigators believe J. JOHNSON was collecting $200 of drug proceeds from an unknown female on behalf of JOHNSON so JOHNSON could obtain a resupply of drugs, "..let me go buy some shit."

61.     On July 16, 2024, at approximately 4:57 p.m. (session 239), JOHNSON used TT3 to receive an incoming call (wire communication) from telephone number (443) 534-8046, which investigators believe is used by Juan Lamont JOHNSON ("J. JOHNSON").  This wire communication occurred as follows:

> JOHNSON:           Good morning.
> J. JOHNSON:        Hey yo.

| JOHNSON: | Huh? |
| J. JOHNSON: | Um, I'm ready go get these jumps off now, right. |
| JOHNSON: | Mmm hmm. |
| J. JOHNSON: | [U/I] the pinkies. |
| JOHNSON: | Okay. |
| J. JOHNSON: | Alright. |

62.    Based upon my training, experience, I believe that that J. JOHNSON was selling opioid pills, and that he intended to sell a specific kind of pill ("pinkies"), "[U/I] the pinkies." Based upon my training, experience, and involvement in this drug investigation, I believe that "pinkies" is a slang term for Oxycodone pills. As discussed previously, I believe J. JOHNSON is a drug re-distributor for JOHNSON and that J. JOHNSON intended to sell the Oxycodone pills soon because J. JOHNSON intended to share the proceeds of the drug sale with JOHNSON.

63.    On August 2, 2024, at approximately 5:44 p.m. session (616), JOHNSON used TT2 to receive an incoming phone call (wire communication) from J. JOHNSON, who used phone number (443) 534-8046. To summarize this wire communication, JOHNSON said he needed to "grab that joint" from an unknown individual whom JOHNSON referred to as "Ace," but JOHNSON was pressed for time to meet with "Ace." JOHNSON asked J. JOHNSON if J. JOHNSON could "grab that joint" for JOHNSON and then come meet JOHNSON to give to to JOHNSON.  J. JOHNSON agreed to do so. Based upon my training, experience, and involvement in this drug investigation, I believe that "joint" is a slang term for a quantity of drugs, although the exact type and quantity of drugs in this instance is unknown. Based upon this information, investigators believe that in this wire communication, J. JOHNSON agreed to obtain drugs from "Ace" and then bring them to JOHNSON.

## 7.    DEMARCO WATKINS

64.    WATKINS is believed to be another supplier of cocaine to TARGET SUBJECT JOHNSON. WATKINS has been intercepted in numerous calls with JOHNSON over TT2 and

TT3 arranging drug sales and discussing drug price, quantity, and quality. WATKINS was also observed via the pole cam arriving and leaving New Vernon Street contemporaneous to calls coordinating meet ups for drug deals.

65.    On July 14, 2024, at approximately 12:12 p.m. (session 63), JOHNSON used TT2 to place an outgoing telephone call (wire communication) to phone number (667) 464-9605, which investigators believe is used by WATKINS. This wire communication occurred as follows:

| | |
|---|---|
| WATKINS: | Yeah, yeah. |
| JOHNSON: | Hey, I uh um. Hey, bro. I been getting the run around, yo, since I seen you, right? Like I, yo, ever since I seen you that day bro, I been getting the run around. So listen, if like I don't, if you can give me at least until today. If don't nothing happen today bro, you know I could, I could bring you the bread back up there or whatever like that. Like you know me, my nigga. |
| WATKINS: | I'm not worried about that. I'm not worried about that. |
| JOHNSON: | Yeah. |
| WATKINS: | I hit you yesterday to see if you was good, did you need some more bread? |
| JOHNSON: | No, no. Woah so listen, Pop, but you already let me tell you what be going on right? I be putting like, yo, like I be having almost like a whole nine out in the street like that's how many different niggas owe me, right? But I be [U/I] the bread before I even collect everything. Right? You know what I mean? So like. |
| WATKINS: | Yeah. |
| JOHNSON: | I want the bread yeah, yeah. I was rushing trying to grab something 'cause my man told me shit was good and now. It's bro, nobody got nothing, bro. This shit crazy, son. Nobody got nothing. I ain't seen it like bro in... since the whole time like in the last year, yo. |
| WATKINS: | Damn. |
| JOHNSON: | Yo it's crazy. A nigga offered me an eight yesterday and I said no I aint want it 'cause he was charging too much. I'm mad as a bitch I didn't take it bro. I'm mad I ain't take it. |
| WATKINS: | I told you, yo. I told you if you want one. I'm telling you all it takes is a little fifteen twenty minute ride real quick from my house. |
| JOHNSON: | Man make a, make a phone call. Make a phone call for me right now bro. |

| WATKINS: | Alright I already told you all you got to do is come pick me up and we can go to the nigga house right now. |
| JOHNSON: | What he going to charge you? |
| WATKINS: | I don't. It depends on what you want. Give me the number, tell me what you want for it. Nine? |
| JOHNSON: | No, I want nine but if he can't do the nine for a good number see what he would charge for the eight. |
| WATKINS: | Alright. |
| JOHNSON: | Let me know something. |
| WATKINS: | I'll call you right back. |

66.    Based upon my training, experience, and involvement in this investigation, I believe that in this wire communication, JOHNSON was having a difficult time collecting money from the drug re-distributors who owed him money, "I been getting the run around, yo, since I seen you, right? Like I, yo, ever since I seen you that day bro, I been getting the run around." JOHNSON asked if he could have more time, until the end of the day, to collect more money to pay WATKINS for a prior drug debt, "So listen, if like I don't, if you can give me at least until today." WATKINS said he had been wondering if JOHNSON needed more time to collect more money to satisfy his drug debt to WATKINS, "I hit you yesterday to see if you was good, did you need some more bread?" JOHNSON replied by saying that he had so many drug re-distributors on the streets who owed JOHNSON money for drugs, that the amount of money could buy a specific quantity of drugs ("a nine"), "I be putting like, yo, like I be having almost like a whole nine out in the street like that's how many different niggas owe me, right?"

67.    Based upon my training, experience, and involvement in this investigation, I believe a "nine" is a quantity of drugs, but the exact quantity or type of drugs is unknown. JOHNSON continued to say that he accounted for all the money he was owed for drugs before he actually collected it, "But I be [U/I] the bread before I even collect everything. Right? You know what I mean? So like." WATKINS said he understood JOHNSON's dilemma, "Yeah." JOHNSON then said that he desperately wanted to collect the money he was owed because he

27

wanted to obtain re-supply of drugs, as an unidentified person had recently told JOHNSON that the illegal drug market was thriving, "I was rushing trying to grab something 'cause my man told me shit was good and now." WATKINS sympathized with JOHNSON, "Damn." JOHNSON said that another drug supplier had recently offered to sell JOHNSON a quantity of drugs ("an eight"), but JOHNSON declined because the price was too high, "A nigga offered me an eight yesterday and I said no I aint want it 'cause he was charging too much." JOHNSON said he regretted not buying the drugs at that time, "I'm mad as a bitch I didn't take it bro. I'm mad I ain't take it." WATKINS said he could take JOHNSON to an unidentified location to see an unidentified drug dealer who could offer JOHNSON a better price for illegal drugs, "I told you, yo. I told you if you want one. I'm telling you all it takes is a little fifteen twenty minute ride real quick from my house." JOHNSON asked WATKINS to contact this other, unidentified drug dealer on JOHNSON's behalf to see if JOHNSON could get a better deal from this other, unidentified drug dealer, "Man make a, make a phone call. Make a phone call for me right now bro." JOHNSON inquired about the price this other drug dealer would charge, "What he going to charge you?" WATKINS said the price would depend on the amount of illegal drugs JOHNSON wanted to buy, "I don't. It depends on what you want." WATKINS asked JOHNSON what amount of illegal drugs he wanted to buy, "Give me the number, tell me what you want for it." JOHNSON asked WATKINS to find out how much an "eight" and a "nine" would cost, then JOHNSON would decide which was the more economical amount to purchase, "I want nine but if he can't do the nine for a good number see what he would charge for the eight." WATKINS said he would find out how much the unidentified drug dealer would charge for the drugs and let JOHNSON know, "I'll call you right back."

68.    A short time later, on July 14, 2024 at approximately 12:19 p.m. (session 64), JOHNSON used TT2 to receive an incoming text message (electronic communication) from

WATKINS, who used telephone number (667) 464-9605. This electronic communication occurred as follows:

> WATKINS:   5400

69.   Based upon my training, experience, and involvement in this investigation, I believe that in this electronic communication, WATKINS said that the unidentified drug dealer alluded to in the prior wire communication in session 63 was charging $5,400 for a "nine" of illegal drugs.

70.   A short time later, on July 14, 2024, at approximately 12:26 p.m. (session 65), JOHNSON used TT2 to receive an incoming phone call (wire communication) from WATKINS, who used phone number (667) 464-9605. This wire communication occurred as follows:

> JOHNSON:   Yo.
> WATKINS:   Yeah, the nigga said 54.
> JOHNSON:   54?
> WATKINS:   Yeah.
> JOHNSON:   For what? For, for the nine?
> WATKINS:   Yup.
> JOHNSON:   Yeah, that's crazy yeah I can't...
> WATKINS:   Hell no. I told him, I say, god damn a nickel won't get it?
> JOHNSON:   Yeah, yeah five would've been too much.
> WATKINS:   He was like no.
> JOHNSON:   'Cause how I sell it bro that's one of the reasons I can't get nothing because like I've gotten myself into that low, low, I've lowered my numbers so low for niggas that I can't even holler at certain niggas when I don't got any. You know what I mean? It's crazy.
> WATKINS:   Right.
> JOHNSON:   But it's all good though I'll let you know something as soon as um…
> WATKINS:   Don't worry about it. I'm still loaded so I ain't tripping.
> JOHNSON:   Alright, bro.
> WATKINS:   You know? The deuce or nothing, you know what I mean? I ain't tripping. I was just calling to see if you needed some more money to get you by until you can do something.
> JOHNSON:   No, no...
> WATKINS:   You know what I mean?
> JOHNSON:   Yeah, nah I'm good bro. I'll let you know.

WATKINS:          Alright.
JOHNSON:          Alright bro

71.    Based upon my training, experience, and involvement in this investigation, I believe that in this wire communication, WATKINS said that the unidentified drug dealer alluded to in session 63 was charging $5,400 for a "nine" of illegal drugs, "Yeah, the nigga said 54." JOHNSON said that price was too high for him, "Yeah, that's crazy yeah I can't..."  WATKINS said he asked the unidentified drug dealer if the unidentified drug dealer would be willing to sell a "nine" to JOHNSON for $5,000 ("a nickel"), "I told him, I say, god damn a nickel won't get it?" JOHNSON said that even $5,000 for a "nine" would have been too much, "Yeah, yeah five would've been too much."  JOHNSON explained that JOHNSON sold drugs to his re-distributors for a low price, so JOHNSON could not afford to pay a high price for his own supply, "'Cause how I sell it bro that's one of the reasons I can't get nothing because like I've gotten myself into that low, low, I've lowered my numbers so low for niggas that I can't even holler at certain niggas when I don't got any."   JOHNSON said he would inform WATKINS when JOHNSON had collected enough money from his re-distributors to pay WATKINS, "But it's all good though I'll let you know something as soon as um…"  WATKINS said there was no rush for JOHNSON to pay WATKINS as WATKINS already had enough money to finance his own illegal drug operations, "Don't worry about it. I'm still loaded so I ain't tripping." WATKINS offered to lend JOHNSON money until JOHNSON was able to collect money from his own re-distributors, "I was just calling to see if you needed some more money to get you by until you can do something." JOHNSON declined the offer, "Yeah, nah I'm good bro. I'll let you know."

72.    In another example, on July 16, 2024 JOHNSON called WATKINS asking why WATKINS didn't answer the phone. JOHNSON tells WATKINS he 'scored a touchdown last night' and 'I was going to hop over to your house and break everything down'. WATKINS says

JOHNSON should've knocked. JOHNSON asks if WATKINS can meet him in Annapolis today. WATKINS agrees and says he can be there in 45 minutes. Investigators also conducted surveillance and observed WATKINS arrive at New Vernon Street. After WATKINS arrives, JOHNSON calls WATKINS and tells someone to let WATKINS in. WATKINS is seen on the pole camera walking to the courtyard. Based on this intercepted call and surveillance and my training and experience, I believe WATKINS obtained a quantity of cocaine ("scored a touchdown"). WATKINS then went to meet JOHNSON at a stash house in the courtyard on New Vernon Street and stayed inside for approximately fifteen minutes to divide the cocaine between himself and JOHNSON ("I was going to hop over to your house and break everything down."). Investigators believe that this location was a stash house because, in other intercepted communications, JOHNSON tells other people he stores drugs there.

73.     On August 4, 2024, investigators intercepted another call between WATKINS and JOHNSON discussing a recent drug supply that JOHNSON gave him. Specifically, at approximately 2:29 p.m. (session 649), WATKINS and JOHNSON had been discussing how JOHNSON's drug customers were complaining that a batch of drugs that WATKINS had previously supplied JOHNSON had a strange taste. During the wire communication of session 649, WATKINS and JOHNSON agreed to meet at JOHNSON's house in Glen Burnie, Maryland, later that same afternoon, at which time JOHNSON would return the strange tasting drugs to WATKINS and WATKINS would give JOHNSON his money back. Based upon this context, investigators believe that when WATKINS texted JOHNSON "I'm here," WATKINS was informing JOHNSON that WATKINS had arrived outside JOHNSON's residence in Glen Burnie, Maryland, to conduct the exchange of drugs and money.

74.    With respect to the "strange taste" of the batch of drugs WATKINS had previously supplied to JOHNSON, JOHNSON and WATKINS discussed that issue in detail in a subsequent wire communication, which occurred on August 4, 2024, at approximately 6:25 p.m. (session 672). This wire communication, between JOHNSON on TT2, and WATKINS on (667) 464-9605, occurred in relevant part as follows:

> WATKINS:    They say it tastes like banana and on the [U/I] like 6 grams.
> JOHNSON:    Hey let me, hey yo jay, tell him bro I'm not even tripping. I just want, ask him can he fix it. Like I don't even know, like I don't know about you Pop, I will fix you. I'm talking about me, I just want something that bite. I ain't even tripping off nothing else.

75.    I believe, based on my training and experience, know that drug dealers often use dilutants to stretch their cocaine supply. In this wire conversation between JOHNSON and WATKINS the dilutant that was used gave the drugs a strange taste that drug customers complained about. JOHNSON then asked WATKINS to contact WATKINS' unidentified drug supplier to either provide JOHNSON a refund or give him a new batch of undiluted drugs, "…I'm not even tripping. I just want, ask him can he fix it."  JOHNSON added that he wanted to obtain drugs that would have a more potent effect on his drug customers, "…I just want something that bite."

76.    On August 16, 2024, in another intercepted call, investigators believe that JOHNSON and WATKINS, were attempting to set up a CDS deal.  During the call, JOHNSON indicated that he was going to see WATKINS that evening and told him that he (JOHNSON) is 'robbing peter to pay paul' and not making any money or 'bread' off of his deals right now. JOHNSON says he's flipping six or seven thousand and not making anything off of it. Based on this intercepted call and surveillance investigators believe JOHNSON was saying that he charged his own drug customers the same amount of money that he paid to his supplier to obtain the drugs,

and because there was no spread between his buying price and his selling price, he was not profiting from his drug deals.

### 8.     SHELDON WELLS

77.     WELLS is believed to be a street level dealer for the New Vernon/Clay Street drug trafficking organization. As discussed above and further discussed below, WELLS has been intercepted in numerous calls with THOMPSON (TT1) and other conspirators.

78.     For example, on June 19, 2024, investigators intercepted a call between WELLS and THOMPSON and WELLS asked THOMPSON to give WELLS a "grizzly to go, hard boy". Based on this intercepted call, I believe WELLS was obtaining a quantity (a "grizzly") of crack cocaine ("hard") from THOMPSON ("boy").  Based upon other intercepted communications and my knowledge of the investigation, I believe WELLS bought drugs from THOMPSON to re-sell to others. I believe THOMPSON sold crack cocaine to WELLS for redistribution because, based on other intercepted communications, I believe that THOMPSON and WELLS reach out to one another to obtain cocaine after they have lined up customers to sell crack to.

79.     On June 26, 2024, investigators intercepted another call between THOMPSON and WELLS and WELLS asked THOMPSON if he had "half a blue you're trying to sell down there". THOMPSON tells WELLS it's not on him but nearby. WELLS asked THOMPSON where THOMPSON is and then tells THOMPSON he'll be right there. Based on this intercepted call, I believe WELLS intended to buy a quantity of drugs ("half a blue") from THOMPSON. WELLS said he would come get the drugs from THOMPSON.

80.     In another example, on July 5, 2024, WELLS called THOMPSON and asked if THOMPSON was still in town, saying "Fat Daddy needs a little sticky stick". THOMPSON told WELLS that he isn't cooking right now. THOMPSON tells WELLS that he has jigs, blues, nickels

and dimes. WELLS tells THOMPSON that he (WELLS) will holla at THOMPSON the next day. Based on this intercepted call, I believe WELLS was trying to buy drugs from THOMPSON. THOMPSON listed the variety of drugs he had for sale, and then WELLS said he would come buy the drugs from THOMPSON the following day.

81.     As noted above, THOMPSON and WELLS communicated on July 8, 2024, and during that communication THOMPSON asked WELLS for "cane" and requested a "half". Based upon my training, experience, and involvement in this investigation, I believe "cane" is a slang term for cocaine and a "half" in this context was a reference to a half ounce of cocaine. During a subsequent intercepted communication on July 8, 2024, WELLS asked THOMPSON to bring the half ounce of cocaine to WELLS and to bring baking soda with it. Investigators believe that THOMPSON and WELLS met up to exchange the half ounce of cocaine and to cook it into crack on this occasion.

82.     THOMPSON and WELLS also had a series of intercepted communications on August 22, 2024. During these intercepted communications, THOMPSON asked WELLS for a "donut," which, based upon my training and experience, I believe to be an ounce of cocaine. WELLS asked if THOMPSON wanted the "donut" "done" or "undone," meaning cooked into crack or not yet cooked into crack. WELLS ultimately agreed to sell THOMPSON the ounce of powder ("undone") cocaine on consignment, and THOMPSON traveled to WELLS home to pick it up from him.

83.     THOMPSON and WELLS also had a series of intercepted communications on September 1, 2024. During those intercepted communications, THOMPSON told WELLS that THOMPSON had a customer who wanted a "ball" of "hard diddy." WELLS replied that he had multiple "balls" for sale. Based upon my training, experience, and involvement in this drug

investigation, I believe a "ball" or "eight ball" is approximately 3.5 grams of crack cocaine, and "hard diddy" is crack cocaine. In a subsequent intercepted communication on September 1, 2024, THOMPSON met WELLS to obtain the ball for re-sale to another customer.

84.    Additionally, WELLS was also observed engaging in drug trafficking activities in New Vernon Street area. For example, on August 29 2024, WELLS was believed to engage in a drug deal when an unknown male approached WELLS. After the male leaves, WELLS was observed on the camera putting a bag with white rocks back in his pocket, believed to be crack cocaine.



**August 29, 2024 – screenshot from pole camera of Sheldon Wells with suspected drugs**

### 9.    ABDULLAH SIMMS

85.    A. SIMMS is believed to be a street level dealer for the New Vernon/Clay Street drug trafficking organization. A. SIMMS using telephone number (443) 422-0086 has been intercepted in numerous calls with THOMPSON (TT1) and other conspirators. Investigators believe A. SIMMS is the user of (443) 422-0086 because he is the subscriber on the account and physical surveillance showed that A. SIMMS used this phone number to arrange meetings with

THOMPSON on or about July 25, 2024. Investigators have also observed A. SIMMS engage in hand-to-hand drug transactions via the pole camera.

86.     For example, on December 21, 2023, investigators utilized a confidential informant[2] ("CI") to conduct a controlled purchase of drugs from A. SIMMS. The suspected drugs that the CI bought from A. SIMMS were subsequently sent to a lab and tested positive for cocaine.



**December 21, 2024 – A. Simms sells crack cocaine to a confidential informant.**

87.     Additionally, A. SIMMS was also observed engaging in drug trafficking activities in New Vernon Street area. For example, on April 26, 2024, A. SIMMS was believed to have engaged in a hand-to-hand drug transaction with an identified white Chevy Suburban that drove

---

2 This CI is a credible and reliable confidential source of information who has been cooperating with the FBI since December 2023. The information CI has provided thus far in the investigation has been corroborated  by pole camera video, pen register and trap-and-trace (PR/TT) data, and other information gained during this investigation. The CI has not provided any information that later proved to be false. The CI began cooperating with this investigation to avoid charges related to possession of drug paraphernalia. Investigators have paid the CI to participate in controlled drug purchase operations. According to NCIC, the CI has prior arrests for 2005 fourth degree burglary and a 2017 Alien Present Without Admission or Parole. The CI has no convictions.

onto New Vernon Street. He was seen counting money after the transaction, and he appeared to use a cell phone to arrange the transaction moments before it occurred.

88.    In another example, A.SIMMS was intercepted talking to THOMPSON (TT1) and a drug customer was later stopped and a heroin/fentanyl mixture was recovered. Specifically, on July 25, 2024, A. SIMMS and THOMPSON discussed A. SIMMS selling 3-grams of heroin to THOMPSON. THOMPSON obtained the heroin from A. SIMMS and subsequently sold it to a known drug customer who was later stopped and investigators recovered 3 grams of heroin/fentanyl from the buyer.

89.    In another example, on August 22, 2024, THOMPSON called A. SIMMS and asked where THOMPSON was. A. SIMMS said he was at home, and THOMPSON replied that "I need like five of them jiffies… I need the bitches a fat pack, wrapped for me." Based on this intercepted call, I believe THOMPSON was asking A. SIMMS to supply him a quantity of drugs packaged for resale so THOMPSON could then sell the drugs to others.

### 10.    KEO WILLIAMS

90.    WILLIAMS is believed to be a street level dealer for the New Vernon/Clay Street drug trafficking organization. WILLIAMS using (443) 569-9351 has been intercepted in numerous calls with THOMPSON (TT1), JOHNSON (TT2 and TT3), and ADAMS (TT4). Investigators believe WILLIAMS is the user of (443) 569-9351 because, through a combination of physical surveillance, GPS pings, and the use of an investigative device known as a cell-site simulator, agents learned that the device assigned call number (443) 569-9351 is always co-located with WILLIAMS, indicating that WILLIAMS carries and uses that device.

91.    On May 30, 2024, officers of the Annapolis Police Department ("APD") conducted surveillance of WILLIAMS in the Clay Street neighborhood of Annapolis. During that

surveillance, the officers observed WILLIAMS engage in hand-to-hand transactions indicative of illegal drug dealing. After observing this activity, the officers conducted a traffic stop on one of WILLIAMS's suspected drug customers. During a search of the suspected customer's vehicle, officers found a clear plastic bag containing five 10mg Oxycodone pills, two 15mg Oxycodone pills, and 25 pressed fentanyl pills. After finding these items in the suspected customer's possession, officers arrested WILLIAMS. Those charges are still pending in Anne Arundel County. During a search of WILLIAMS' person incident to the arrest, officers found a pill bottle containing 95 10mg Oxycodone pills that appeared to be the same variety of pills that officers found in the suspected customer's possession.

92.    For example, on August 20, 2024, JOHNSON used TT2 to receive an incoming phone call from WILLIAMS. The phone call occurred as follows:

| | |
|---|---|
| JOHNSON: | Yo |
| WILLIAMS: | Yo. |
| JOHNSON: | You in town? |
| WILLIAMS: | Yeah, who this? |
| JOHNSON: | This Black. This C. |
| WILLIAMS: | Oh, yeah, yeah. I'm in town. |
| JOHNSON: | You gucci? |
| WILLIAMS: | Yeah, pinks. |
| JOHNSON: | I'm ready walk up. |

93.    Investigators believe that in this phone call, JOHNSON was asking to buy drugs from WILLIAMS. JOHNSON asked if WILLIAMS had drugs for sale, "You gucci?" WILLIAMS said he had opioid pills ("pinks") for sale, "Yeah, pinks." Investigators believe "pinks" is a slang term for opiod pills, which JOHNSON sought to buy from WILLIAMS for re-distribution. When WILLIAMS said he was "gucci" for "pinks," meaning that he was ready to sell opioid pills to JOHNSON, JOHNSON said he would walk up to WILLIAMS' location. Based on this conversation, investigators believe JOHNSON met with WILLIAMS to buy pills on this occasion.

94.    On September 7, 2024, investigators intercepted a wire communication between THOMPSON and WILLIAMS. In this intercepted communication, WILLIAMS agreed to provide THOMPSON a "half" of "hard" that was in "one piece." Based upon my training, experience and involvement in this investigation, I believe that in this wire communication, WILLIAMS agreed to sell THOMPSON a half ounce of crack cocaine ("hard"). In the follow up conversation to this intercepted wire communication (which is explained below), WILLIAMS and THOMPSON met up to exchange the crack cocaine.

95.    As another example, on September 7, 2024, THOMPSON used TT1 to receive a phone call from WILLIAMS. The ensuing conversation occurred as follows:

| THOMPSON: | Yeah. |
|---|---|
| WILLIAMS: | You want it hard, right? |
| THOMPSON: | Yeah. |
| WILLIAMS: | Yeah. And I bet you it's the best thing you ever had in your life. |
| THOMPSON: | No, it's not. I just got something to go on right now. I got a play up top. |
| WILLIAMS: | Alright. I'm coming. |
| THOMPSON: | How long you going to be? [call ends] |

96.    Investigators believe that in this conversation, WILLIAMS was selling crack cocaine to THOMPSON for redistribution. WILLIAMS asked if THOMPSON wanted crack, "You want it hard, right?"  THOMPSON replied that he wanted potent drugs, "…the best thing you ever had in your life."  Based on other intercepted communications, investigators believe that THOMPSON intended to resell the crack cocaine from WILLIAMS to another drug customer.

97.    On September 9, 2024, investigators intercepted another wire communication between WILLIAMS and THOMPSON. In that intercepted communication, WILLIAMS said that THOMPSON would have to wait five minutes unless THOMPSON wanted it in powder. WILLIAMS said he could give "it" to THOMPSON in a short while, or WILLIAMS could give

him powder now. WILLIAMS said he did not know how to "put it together," so he was having someone help him. THOMPSON ultimately decided to wait. Based upon my training, experience, and involvement in this investigation, I believe that this intercepted wire communication shows that WILLIAMS possessed powder cocaine, which he was cooking into crack ("putting it together") with the help of someone, to sell to THOMPSON.

### 11. TIJEE BENETT

98.     BENETT is believed to be a street level dealer for the New Vernon/Clay Street drug trafficking organization. BENETT using (443) 822-1938 has been intercepted in numerous calls with THOMPSON (TT1), ADAMS (TT4), and other conspirators. Investigators believe BENETT is the user of (443) 822-1938 because, during intercepted communications, including recorded jail calls involving inmates at Maryland correctional facilities, THOMPSON and others referred to the user of (443) 822-1938 by BENETT's known nickname, "Goo Goo."

99.     During the investigation, investigators observed over pole camera footage BENETT engaged in hand-to-hand transactions with others that are indicative of illegal drug dealing. For example, on August 6, 2024, THOMPSON used TT1 to place a phone call to BENETT. During the ensuing phone conversation, THOMPSON asked BENETT, "What you want for a half?" BENETT said, "Shit, I want at least four, bro." THOMPSON said he only wanted to pay $375, and BENETT replied, "I need four, bro. I can't even, I can't even bend a brick." After they agreed that THOMPSON would give BENETT $375 that night and $25 the following morning, BENETT said he had to go to his house to "get it" and would come back to meet THOMPSON. Investigators believe that in this intercepted telephone conversation, THOMPSON was buying half an ounce of cocaine from BENETT. THOMPSON and BENETT

negotiated a price, after which BENETT went to his house to get the cocaine to bring it back to THOMPSON.

100.   In another example, on August 16, 2023, BENETT was sitting on the street corner on New Vernon Street when a dark blue Mazda drove onto the street and stopped in front of BENETT. BENETT walked over to the car, leaned inside and handed something to the occupant(s) of the car (see screenshot below). BENETT stood up and walked away from the car with a wad of money in his hand as the car drove away. Based on my training and experience, I believe BENETT handed the occupant(s) of the car drugs, and they handed him money in exchange.



**August 16, 2023 – screenshot of BENETT suspected drug transaction**

101.   On September 6, 2024, THOMPSON used TT1 to place a phone call to BENETT. During the ensuing telephone conversation, THOMPSON asked if BENETT had some "stones" for sale, by which investigators believe he meant crack cocaine. THOMPSON said he wanted a "rick", which investigators believe is a quantity of crack cocaine. BENETT said yes, and THOMPSON asked, "What's the number?", by which he meant how much money did BENETT want for the crack cocaine. BENETT said he wanted $225 for a "rick" of crack cocaine. THOMPSON then explained that a "half" should cost about $340, and a whole "joint" should cost

about $700. Based on my training and experience, I believe these prices correspond to a half ounce and a whole ounce of cocaine, respectively. After briefly discussing prices and quantities, THOMPSON agreed to buy a whole ounce of crack cocaine from BENETT for $700. Based upon My knowledge of the investigation, I believe THOMPSON was purchasing crack from BENETT for redistribution.

## III. CONCLUSION

102.  To summarize the investigation, FBI agents have intercepted multiple communications and conducted physical surveillance indicating that WATKINS and A. JOHNSON supply cocaine to JOHNSON, and on one occasion, investigators seized an ounce of cocaine from a transaction involving A. JOHNSON and JOHNSON. Investigators have also intercepted multiple communications indicating that JOHNSON supplies cocaine to THOMPSON.

103.  Investigators have also intercepted multiple communications and conducted physical surveillance which indicates that THOMPSON, WELLS, R. SIMMS, A. SIMMS, J. JOHNSON, WILLIAMS, BENETT and ADAMS buy, sell, and trade cocaine and other drugs amongst themselves for the purposes of distribution. Investigators have seized crack cocaine and heroin from THOMPSON and A. SIMMS during controlled purchases with confidential sources and as well as during traffic stops of drug customers that were stopped after leaving the New Vernon Street drug shop and meeting with the TARGET SUBJECTS.

104.   Based on the foregoing, I respectfully submit that there is probable cause to issue the requested criminal complaints and arrest warrants for the TARGET SUBJECTS LARRY ADAMS, CURTIS JOHNSON, OLANDO THOMPSON, RODRICK SIMMS, JUAN LAMONT JOHNSON, DEMARCO WATKINS, SHELDON WELLS, ABDALLAH SIMMS, AUREON JOHNSON, KEO WILLIAMS, and TIJEE BENETT.

JOSHUA
MEGLI

Digitally signed by
JOSHUA MEGLI
Date: 2024.09.30
10:59:54 -04'00'

Josh Megli, Special Agent
Federal Bureau of Investigation


Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 4(d) this _____30th_____ of September 2024.

Honorable Erin Aslan
United States Magistrate Judge
District of Maryland